Good morning, Mr. Delaferra. Yes, Your Honor. Good morning. May it please the Court, my name is Richard Delaferra. I represent the appellant, Galeon Mark, in this matter. I would like to reserve three minutes for rebuttal. That request will be granted. Thank you. We have raised four issues in this appeal. The first issue that I'd like to address is the defense counsel's motion to continue the trial date for 90 days based on his recent appointment to the case in a rather complex RICO case involving about 14,000 pages of documents, 1,500 recorded conversations, and 45 days of prior trial transcripts involving Mr. Mark and the accusations that were in the RICO indictment. But didn't counsel, in fact, actually get 87 days? Your Honor, he got 87 days from the date that he was appointed on February 5th. Counsel was asking for 90-day extension of the trial date, which was March 22nd. So he was effectively denied six weeks of trial preparation that he was asking for. So he got 42 and was asking for 90. He got . . . I believe, Your Honor, his math is correct. And I think the important thing, even to parse it that way, one might say, well, he got maybe 50 percent of what he was asking for. But I think counsel had a right to seek the 90 days of prior trial. And for the court to deny him the 90 days in light of the fact that the prior counsel was appointed in May of 2010 . . . Let me ask you a question. I understand your point. But here's the problem that I'm having. All right. The argument can be made, this is a egregious judge. He's not that experienced in this type of law. He wanted 90 days. He only got 42 days. But as we think about these issues, we know district court judges have very busy calendars. They're constantly under pressure to move their cases, et cetera, right? We're all familiar with that. So in this instance, the request was for 90. They got 42. What kind of context should we put this in, in thinking of a rule? The next case will be, Judge, I asked for 8 weeks. I only got 6. There were tapes up the wazoo. There were transcripts and so forth. We've all heard these arguments on the bench, off the bench for 30 years, right? Particularly when the tape cases were in the 80s and so forth. So what is it that you are specifically asking us to look at and say, this is the case that really requires reversal? Well, Judge, I'd ask the court to first look at the Charleswell case that was cited in the brief, where this court reversed a conviction on a ground of a denial of a motion to continue. And if you look at the facts in that case, where the counsel had specifically asked for a particular date of, I believe it was February the 10th or February, I'm sorry, February 11th. Leading up to that trial date, he had a family emergency. He was off Virgin Islands originally. He was off island for a week. Now granted, because he had the case, I believe since October of the previous year, it would be assumed that he had prepared up to that point. This court interestingly pointed out that trial counsel typically do not finalize their trial preparations until about a week before trial. I thought that was an interesting observation to assume that no significant preparation had been done to that point. But what happened is when the counsel had the week before trial that he had chosen, when he could not prepare because he was off island at a funeral, this court indicated that that was sufficient . . . it was a sufficient basis for the trial judge to continue the case and that the trial court's reason for not continuing the case in that at St. Thomas at the time, in Superior Court, it was a superior territorial case that worked its way up to this court at that time, those judges shared courtrooms. And the judge stated that, well, if I don't try this case this week, it's going to be three weeks before I'm up in the, quote, batting order. And this court stated that the substantial interest of the defendant to have his case adequately prepared should have prevailed. And Charswell also cited the Unger v. Serafite case out of the Supreme Court that says myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to continue. So now back to your question, Your Honor. This is a case where considering everything that had gone on and considering the history of the case, the prior counsel had been essentially given ten months to prepare for trial. When the first trial order was entered in July of 2009, setting a trial date of October of 2009, the very court that denied the second counsel the continuance of the 90 days stated that voluminous discovery and the defendant's incarceration off-island in Puerto Rico compelled the court to give a lengthy continuance. Nothing changed when Mark Hodge, the second counsel, took the case. There was still voluminous discovery that Mr. Hodge had to get up to speed on. Additionally, the defendant was still over in Guaynabo in Puerto Rico. And as was noted in Mr. Hodge's motions, the discovery had actually increased since the July order setting trial in October. And other continuances had been granted along the way. Some, one on December 30, 2009, appeared to be a joint motion with the government. So it's perplexing to imagine why the prior counsel got so many continuances recognizing the voluminousness of the discovery and the complexity of the case and the other issues involving the defendant's incarceration off-island, why that ceased to be a problem when Mr. Hodge took the case. And another issue that Your Honor raised was the issue that Mr. Hodge is not a criminal practitioner and indicated that he was not familiar with Rico law. Rico was . . . So he wasn't on the CJA list. This was a retained case? It's very interesting, Your Honor. I don't know if the court is aware of this, but all members of the Virgin Islands Bar are required to take appointments regardless of their expertise so that a real estate law practitioner or a wills and trusts law practitioner can and does get appointed to cases of this nature, cases in superior court of first-degree murder. And so I would think . . . Is that pro bono or is that CJA? It's a CJA by understanding. I'm not a member of the Virgin Islands Bar, but . . . We used to do the same thing in Delaware until we finally changed. Right. What was his practice here? Is it in the record? I believe it is. He's a civil practitioner, a civil litigator. And I think that that's interesting that if it is going to be the practice of the district court to appoint practitioners who are not familiar with criminal law, should they not be granted a continuance of counsel's choosing provided that it's reasonable? I think asking for a 90-day extension of the trial date was not unreasonable given the complexity . . . But let me phrase this another way. Nor does it appear that a 45-day continuance is objectively unreasonable. Isn't what you're driving at here almost an ineffective assistance of counsel claim that you still have to be able to raise in a collateral proceeding? Isn't there more support for that if, in fact, Hodge wasn't qualified to handle this voluminous, complex RICO case? Well, certainly, I think there's evidence of ineffectiveness in the record. I would point out to one specific instance because it comes back to Charleswell, the unpreparedness in preparing a defense witness. In Charleswell, it was a doctor that could conceivably testify about the defendant's mental health that was an issue in the case. In this case, there was a woman that was called as a records custodian for a veterinarian that treated Mr. Mark's dogs. Counsel—and it's in the record, it's in the appendix— counsel learned that morning that not only was this woman a records custodian of the veterinarian, she was also a veterinary technician who could testify to the nature of a particular wound on a dog that was brought in by Mr. Mark and to testify that it was not from dogfighting. However, because counsel had not been prepared to learn that and present that, it couldn't come in, and it's clear in the record. So I look at—and I've run out of time, but if I could just finish this thought—I look at what this Court did in Charleswell, didn't evaluate it from an ineffective assistance of counsel aspect as like a collateral looking at unreasonableness and prejudice, just said that the unpreparedness of counsel, given the circumstances, rendered the right to counsel an empty formality and also violated the defendant's right to due process. Isn't your argument really more that—primarily that no matter the experience, civil or criminal, no matter the sophistication, that objectively speaking, given the size of the record and the acknowledgment by the district court on prior occasions of its complexity, that this was not an unreasonable request and the fact that it was denied by more than 50 percent would render anyone in that position at a disadvantage to represent their client zealously? You know, I wouldn't go that far. I wouldn't, and I think that it's significant that counsel asked for a particular period of time within which to be prepared, which was not on its face unreasonable, and it was denied. Now, if I could just go one step further, if counsel had asked for the 90 days and then at the end of the 90 days or coming up on the 90 days, he asks for more time, now I think we're in a situation where, Your Honor pointed out first off, is that, you know, if we let counsel run the docket or let counsel constantly complain of unpreparedness, when are we ever going to get cases tried? I seem to surmise that that's where Your Honor was going with that, but here, as in Charlesville, where a date was chosen, here a date was chosen and it was denied, and I think that that's significant, that if a lawyer comes before the court as an appointed counsel and says, I need 90 days to prepare, given all the circumstances, the complexity of the case, and counsel's understood unfamiliarity with the law, I think that it's an abusive discretion to deny. Are you saying that under these circumstances, that consideration of the docket is an improper factor for the court to look at? Well, it is . . . I think it is. I think it is. It should never be . . . I can say this in response to that, that if a defendant, not this case, but if a defendant insists upon a speedy trial, the congestion of the court's time, so turning . . . analogizing that to this case, is that the expediency of trying the case should not outweigh the defendant's interest in preparing for trial, and I would point out that the record is devoid of any evidence of a countervailing interest as to why the 90-day request was denied. There's just no . . . there's no reason given for it. So, I think in the absence of any reason for the denial of what would otherwise be a reasonable request under the circumstance was an abusive discretion. All right. Thank you. All right. Mr. Delaferro, we'll have you back on rebuttal. Mr. Page? Good morning again. Nolan Page on behalf of the United States. Your Honor, counsel couches this argument as counsel being denied a continuance, but I would couch this as counsel was actually granted a partial continuance. He requested a 90-day continuance. However, he was given 87 days from appointment to prepare to try this case. Eighty-seven days. I understand that this is not a case about the Speedy Trial Act. However, under the Speedy Trial Act, counsel would have been given 70. I understand the arguments of counsel. However, it was well within the court's discretion to give him a partial continuance of 42 to 45 days to prepare. It was not an abuse of that discretion to do so. Given the size of the record, it wasn't an abusive discretion? I'm sorry? I said, given the size of the record, it wasn't an abusive discretion? No, Your Honor. It was not an abuse of discretion given the size of the record. I'm sure that that is . . . I'm sorry? Did counsel have access to the discovery that had been done by prior counsel? Yes, he did. From the outside of this particular case, counsel could have had access to that by way of the U.S. Attorney's Office. We were more than willing to provide a discovery to counsel prior to trial. Did you? That was an open invitation at every stage. That he didn't take advantage of? That is correct, Your Honor. I believe the record will show you as well that the government did not object to any of these requests for continuances. However, I will come back to the fact that counsel . . . Well, you didn't object to the continuances of prior counsel, which is, I thought, appellant's counsel's point here. If there were these series of continuances with prior counsel with an acknowledgement by the court of the complexity of the case, why now when new counsel comes in and what is seemingly a reasonable request of 90 days is requested, now from the appellant's point of view, the court is concerned about the alacrity of the calendar rather than giving counsel sufficient time to prepare? Yes, I understand that, but again, it's our position that it was within his discretion to do so. He did not summarily deny the continuance. I mean, I'm sure he took all considerations to note, but he did not summarily deny the continuance and he granted it for some 40 some odd days, again, 87 days from his appointment. And counsel cites government versus . . . Let me ask you this question. I'm sorry. You can get back to that case in a moment. We have before us a representation that the volume of the discovery was 14,000 pages. What is the nature of that 14,000 pages? Is it in the record? For instance, is it mostly transcripts or is it mostly reports? The nature of the 14,000 pages actually was what the government did out of an abundance of caution. This was a recode that we charged and it encompassed some other cases that had already been tried. What we did was provide discovery in those cases as well, just out of an abundance of caution. Okay, so historical . . . Historical. . . . sixes, 302s. That's correct. Okay. Just to be fair, that was no obligation for us to do that. We did that only out of an abundance of caution. We just provided discovery in two other cases. That made up the 14,000-some-odd pages of discovery. So the bulk of the 14,000 was background from two other cases? Absolutely. There was a 2005 case and I think a 2006 case. Our case was 2009. Just because some of the evidence touched upon it historically, we just thought it best to provide it. And that was the purpose for doing that. I think counsel referenced some hundreds of telephone calls, I think maybe thousands. However, in this particular trial, there was probably less than 50 of them. Mr. De La Pera's client wasn't implicated by and large in the other two cases that you're referring to? Yes, he was. He was. He was. By implication or was he charged? He was charged as well. Okay. So it would be the government's position that, you know, especially I want to get back to that government versus Charleswell. There are distinctions in that particular case between that one and this one. In the first instance, in Charleswell, that particular attorney was a sole practitioner. Mr. Hodge, in this case, belonged to a firm with paralegals that he referenced in his filing. Secondly, this was an attorney who needed more time to prepare due to an unexpected death in the family that was off-island. And in this particular case, that was not the case. The one thing that is common between the two is that both counsels asked for a continuance and it was denied. Along that same line but for a different reason. It wasn't raised by counsel in his argument. But why was so much information needed in this case by the government about the Spring Act organization? Excuse me one second. You know, the evidence regarding the Spring Act organization was relevant. I mean, as the district court found in its order denying the Rule 29, that it was relevant to Mr. Mark's independent trafficking activities as well. And the trial court actually couched it as it was relevant to give context to the racketeering activity. So he gave it the proper analysis under 401 and 403 and he found that it was probative of the structure of Mark's enterprise, which was an element that the government had to prove. Do you have anything else, Mr. Fay? I have nothing further. So let me ask you this. Maybe this is burrowing deep into 14,000. But in the two historic conspiracies that were the bulk of the discovery, did the government at trial seek to introduce any evidence of historical conspiracy in the RICO charge in 2009? Yes. It was one of the racketeering. The two other cases comprised two of the racketeering acts within this case. But it was not a full-fledged presentation of the evidence to prove those particular elements because that wasn't our burden. But it did bump up against it. All right. That's helpful. Thank you. Thank you. Mr. Della Fera? Yes. Thank you. Just to be clear, as Mr. Page just told the Court, the predicate acts of the racketeering in this case were the cases that Mr. Mark was tried on in the other cases. So the 14,000 pages relate directly to that. And two points to make. When a defense counsel gets 14,000 pages of documents, it typically doesn't come with notations on what's relevant and what's not. So it's incumbent upon counsel to cull through every one of those documents to determine what's relevant. When a defense counsel gets 1,500 recorded conversations, it typically doesn't come with notations as to which tapes are related to your client. Either he's speaking or he's referred to by co-conspirators. So while I appreciate the government saying that there was an open invitation and there's nothing in the record, but I'll assume that Mr. Page was more than willing to help Mr. Hodge along, that's a lot of information to go through, particularly when you're dealing with issues, not only the evidence, but the issues of RICO. RICO is a very, very complex statute, even for a criminal practitioner to get his head around, as opposed to a civil practitioner. I know that I'm in rebuttal, but I would be remiss if I didn't at least touch upon the dogfighting. I do want the Court to consider whether there was sufficient evidence of the dogfighting, whether it was actually related to the RICO conspiracy. If the Court looks at the testimony of Elton Turnbull and Glennson Isaac that testified about the dogfighting activities, there was talk that it was a hobby, it was a sport, yes, they gambled on it. The question was coming up as to, well, is your drug money used to fund the gambling? And Glennson Isaac was the one who was attempted to pin him down on that. And he was saying that he spent his drug money in the dogfighting and that he was asked, without your drug money, can you afford to gamble on dogs? And he said, you can, but then there was an objection that was sustained. Wasn't part of the evidence that that was the sole source of income? No, actually, Mr. Mark owned a pet store on St. Thomas, so he did have a legitimate I know he had a legitimate, but with regard to the other ones, it was pretty much their sole source, no? I don't know that there was any evidence one way or the other as to whether they had And when each witness is speaking, it's clear they're speaking on behalf of themselves. If you look through the record, there's nothing to say that, oh, Mark was spending his drug money on the dogfighting as well. And then the only other point that I would make that was raised in the brief, and I see the red light is on, is whether the dogfighting, the Virgin Islands dogfighting statute was a gambling statute versus an animal protection statute. It is in the animal protection chapter of the code. There is language in the statute that if one willfully encourages a dog to bite, so we'd ask the court to consider whether there was sufficient evidence and relatedness with regard to the dogfighting in relation to the RICO conspiracy. Thank you very much. Okay. Thank you, Mr. Bill. I thank both counsel for a well-argued case, and we'll take the matter under advisement.